CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAR 28 2012
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| ADELSON MICHEL, | ) |
| Petitioner, | ) Criminal Action No. 5:06-cr-00041-01 |
| v. | ) **MEMORANDUM OPINION** |
| UNITED STATES OF AMERICA, | ) By: Hon. Glen E. Conrad |
| Respondent. | ) Chief United States District Judge |

Adelson Michel ("Michel"), a federal inmate, brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (2006). After an evidentiary hearing before United States Magistrate Judge B. Waugh Crigler ("Judge Crigler") on the government's motion to dismiss, Michel filed objections to the Magistrate Judge's Report and Recommendation ("Report"). For the reasons that follow, the court will grant the government's motion to dismiss and deny Michel's motion to vacate.

I. **Factual and Procedural Background**

On September 6, 2006, a grand jury in the Western District of Virginia returned a twenty-nine count indictment stemming from a crack cocaine conspiracy in Winchester, Virginia. (Docket No. 3.) Among the twelve defendants named in the indictment was Michel, who was charged in eight of the twenty-nine counts. More specifically, Michel was charged with one count of conspiracy to distribute 50 or more grams of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), and with seven counts of distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C).

Michel was tried before a jury in Harrisonburg over a four-day period from March 26 to March 29, 2007.[1] In its case-in-chief and on rebuttal, the prosecution presented approximately twenty-six witnesses, including thirteen law enforcement officers, three experts, and three co-defendants who had pleaded guilty (Mark Fleurival, Roland Jackson, and Robert Scott). United States v. Kellam, 568 F.3d 125, 130 (4th Cir. 2009), cert. denied, 130 S. Ct. 657 (2009). Seven other prosecution witnesses—most of whom had pleaded guilty to related drug crimes—testified to being involved in various crack cocaine transactions with Michel. Id. The defense called seven witnesses, six of whom were prosecution witnesses recalled for impeachment purposes. Id. at 130–31. The remaining defense witness was another codefendant named Tiffany Sloane, who had also pleaded guilty to the conspiracy.[2] Id. at 131 n.5. Michel did not testify at trial.[3] Id. at 131.

On March 29, 2007, the jury returned its verdict, finding Michel guilty of the one conspiracy count, and of six of the seven counts of distribution of crack cocaine.[4] After denying several of Michel's post-trial motions, the court sentenced him on September 6, 2007 to a total term of imprisonment of 324 months. On June 3, 2008, the court granted Michel's motion to reduce his sentence pursuant to the November 1, 2007 Amendments to the United States Sentencing Guidelines, reducing Michel's term of imprisonment to 262 months.[5]

After unsuccessfully appealing his convictions and sentence to the United States Court of Appeals for the Fourth Circuit and seeking a writ of certiorari in the Supreme Court of the

---

[1] Michel was tried jointly with another co-defendant, Charceil Kellam.

[2] Sloane "was apparently called in an effort to attack the credibility of prosecution witnesses and show that Michel was not involved in the alleged conspiracy." Kellam, 568 F.3d at 131 n.5. However, Sloane acknowledged on cross-examination that "several of her codefendants, including Michel, had been involved in drug trafficking in the Winchester area." Id.

[3] Kellam also did not testify at trial. Id. at 131.

[4] The remaining distribution count was dismissed before the trial pursuant to the government's motion.

[5] Michel has filed a new motion for an additional sentencing reduction based on the Fair Sentencing Act of 2010, which is currently pending before this court.

2

United States, Michel timely filed the present motion to vacate on August 23, 2010. (Docket No. 787.) Michel advanced multiple claims in his motion, all except one of which were dismissed by this court in response to the government's motion to dismiss. Michel v. United States, Criminal Action No. 5:06-cr-41-1, Civil Action No. 5:10-cv-80281, 2011 WL 767389 (W.D. Va. Feb. 25, 2011). The court then referred the case to Judge Crigler for an evidentiary hearing on Michel's sole surviving claim in this § 2255 motion—specifically, that Michel's trial counsel, Gary Lance Smith ("Smith"),[6] "was ineffective in failing to apprise [him] of his right to testify at trial." Id. at *8.

Judge Crigler convened an evidentiary hearing on October 12, 2011, at which the court heard testimony from Michel and Todd Freiwald ("Freiwald") of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the principal investigator in the case. Michel was represented by court-appointed counsel. On direct examination, Michel testified that the only contact he had with Smith before trial was a single visit by Smith to the jail where Michel was detained pending trial. (Docket No. 897 at 14–15.) Despite Michel's poor English capabilities at that time,[7] Smith failed to bring a Haitian Creole interpreter with him, Michel testified. (Id. at 12, 17.) Not once (either at the sole jail visit or at the trial), according to Michel, did Smith ever apprise Michel that he possessed a right to testify at trial in his own defense. (Id. at 15–19.) Smith likewise failed ever to discuss with Michel whether he should testify at trial, Michel stated. (Id.) However, Michel testified, he told Smith directly during the jail visit that he wanted to testify in his own defense and, furthermore, Michel communicated that desire to the interpreter (and not to Smith) during the trial. (Id.) According to Michel, though, the interpreter never

---

[6] Smith was terminated as Michel's trial counsel on June 27, 2007. (Docket No. 904 at 4 n.3.) Smith subsequently died and, thus, was unavailable to testify at the evidentiary hearing. (Id.)

[7] Michel testified that his English language capabilities have since improved through schooling. (Docket No. 897 at 16.)

3

conveyed that request to Smith during the trial. (Id. at 16, 19.) Furthermore, Michel took issue with Smith's performance at trial, alleging that Smith conducted poor cross-examinations of the government's witnesses and failed to contest the witnesses' credibility while arguing to the jury. (Id. at 44–46.)

According to Michel, if he had known that he had a right to testify, he would have taken the witness stand to fill in the gaps in the case that Smith allegedly had left through his deficient performance. More specifically, his testimony "would have concerned the truthfulness of the Government's witnesses, his denial that he knew several of them, and other matters relating to their personal motives for testifying against him." (Docket No. 904 at 5.) In short, Michel's aspiration to testify at trial emanated from his desire to profess his complete innocence of the charges for which he was prosecuted and ultimately convicted.

On cross-examination at the evidentiary hearing, the Assistant United States Attorney questioned Michel on his English proficiency during the period from 2003, when he moved from Florida to Winchester, to 2007, when he was tried. According to Michel, he lived in Winchester with his girlfriend, Laquita Sloane, during that time period. (Docket No. 897 at 53.) Michel communicated with Sloane only in English, because that was the only language that she knew. (Id.) However, Michel nonetheless maintained that his English was poor at that time, and that he had only limited interactions in Winchester with people other than Sloane. (Id. at 53–54.) Furthermore, Michel retreated on cross-examination from his previous statement that Smith had contacted him only once prior to trial—instead, Michel testified that Smith had visited him in jail numerous times in 2006 and 2007 prior to trial. (Id. at 55–56.) Michel acknowledged that he also communicated with Smith before trial by telephone. (Id. at 57.) However, according to Michel, Smith never discussed the case with Michel during those communications. (Id. at 56.)

Instead, his conversations with Smith at the jail and by telephone consisted only of Smith telling him to plead guilty. (Id.) Michel further testified that Smith never discussed the case with him at trial, either. When asked about portions of the trial transcript indicating instances where Smith would confer with the defendant during trial, Michel accounted for such instances as times when, during a witness' testimony, Michel would tell Smith, "I don't want them on the stand." (Id. at 67.)

Furthermore, on cross-examination, the Assistant United States Attorney asked, "I want to make sure I understand your position. I mean, you knew you had a right to testify; correct?" (Id. at 68.) Michel responded, "I knew that I could talk if I wanted to, but I didn't know that I had the right." (Id.) Michel also testified on cross-examination that he would be satisfied with an attorney's services only if he prevailed on his § 2255 motion. (Id. at 48.)

Freiwald was the only witness called by the government during the evidentiary hearing. Freiwald's testimony concerned two main points. First, Freiwald testified that, prior to trial, he met with Smith and Michel to review an evidentiary videotape.[8] (Id. at 77.) Second, Freiwald testified that his interaction with Michel during this meeting afforded Freiwald an opportunity to assess Michel's English proficiency and, based on his observations, Freiwald testified that he detected no difference in Michel's English during the evidentiary hearing as compared to his English at the prior meeting related to the videotape. (Id.)

Following the evidentiary hearing, Judge Crigler submitted his Report in which he recommended that this court deny Michel's motion to vacate and grant the government's motion to dismiss. (Docket No. 904.) The Report reflected Judge Crigler's observation that Michel's "demeanor and conduct while testifying did not instill confidence in the substance of that

---

[8] Earlier in the hearing, Michel had testified that this meeting with Smith and Freiwald never happened. (Id. at 58–59.)

5

testimony." (Id. at 14.) Judge Crigler found that Michel's testimony was laced with contradictions and found disingenuous Michel's allegations regarding Smith's performance. (Id. at 14–15.) Furthermore, the trial transcript refuted Michel's assertions regarding Smith's allegedly abysmal performance at trial—specifically, the transcript revealed that Smith's cross-examination of government witnesses probed their own involvement with drugs and their incentive to cooperate with law enforcement. (Id. at 15.) Judge Crigler noted that the transcript further demonstrated that, in his closing argument to the jury, Smith sought to undermine the credibility of the government's witnesses, stressing that they were convicted felons and highlighting their own plea bargains with the government. (Id. at 12–14, 16.)

In addressing the merits of Michel's ineffective assistance of counsel claim under the rubric of Strickland v. Washington, 466 U.S. 668 (1984), Judge Crigler found that, based on Michel's own testimony at the evidentiary hearing, Michel "knew he could testify in the case, even though he may not have been apprised of the right to do so by Smith." (Docket No. 904 at 17 (emphasis in original).) However, because the government adduced no affirmative evidence demonstrating that Smith had informed Michel of his right to testify and, furthermore, because the government could not contradict Michel's allegation that he attempted at the trial to invoke his right to testify, Judge Crigler concluded that Michel had established deficient performance under Strickland. (Id.)

However, Judge Crigler concluded that Michel's ineffective assistance of counsel claim must fail because Michel could not prove that he had suffered prejudice as a result of Smith's deficient performance. (Id. at 18–19.) More specifically, because Michel's proffered testimony would offer nothing above and beyond what Smith already established through his cross-examinations and closing argument, Judge Crigler concluded that Michel had failed to prove that

there was a reasonable probability that his testimony would have changed the outcome of the trial. (Id.) In fact, "it [wa]s [Judge Crigler]'s view that [Michel's] proffered testimony would have sealed his conviction." (Id. at 19 n.13.)

Michel, through counsel, then filed objections to the Report. (Docket No. 906.) Essentially, Michel disputes Judge Crigler's reliance on the Strickland standard (i.e., whether there is a reasonable probability that, but for counsel's ineffective performance, the outcome would have been different) in determining whether Smith's deficient performance prejudiced Michel. (Id. at 1–2.) Instead, Michel argues that the relevant inquiry in "right to testify" cases, such as this one, is the standard announced in Owens v. United States, 483 F.3d 48 (1st Cir. 2007)—whether Michel would have offered genuine exculpatory testimony at trial. (Id. at 2.) Based on this standard, Michel contends that, although Smith may have attempted at trial to impeach the credibility of the government's witnesses, Michel's testimony would have constituted the only affirmative exculpatory evidence offered by the defense at trial. (Id. at 7.)

Having received Michel's objections, and having received no objections from the government, the court will now proceed to disposition.

## II. Discussion

### 1. Standard of review

To state a claim for relief under § 2255, a defendant must prove that one of the following occurred: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). In a § 2255 motion, the convicted defendant bears the burden of proving grounds for a collateral attack by a preponderance of the evidence. Miller v. United

States, 261 F.2d 546, 547 (4th Cir. 1958) (per curiam). Furthermore, once a defendant has waived or exhausted his appeals, the court is "entitled to presume he stands fairly and finally convicted." United States v. Frady, 456 U.S. 152, 164 (1982). Thus, unless the petitioner alleges a jurisdictional or constitutional error, any asserted error—of fact or law—will not provide a basis for collateral attack unless it constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (internal quotation marks omitted).

2. **Analysis**

As stated above, Michel raises an ineffective assistance of counsel claim on his § 2255 motion, contending that Smith failed to inform him of his constitutional right to testify in his own defense and, furthermore, that he attempted unsuccessfully at the trial to invoke (through the interpreter) his right to testify. To prove a claim of ineffective assistance of counsel, a defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. However, the court determines that no substantive consideration of the Strickland factors is required by this case because, as explained below, the court finds completely incredible Michel's factual allegations regarding Smith's performance.

    a. **Strong evidence supports Judge Crigler's finding that Michel's testimony is not credible**

The record of the evidentiary hearing shows that there is strong evidence to support Judge Crigler's finding that Michel's testimony is not credible. (Docket No. 904 at 14–16.) As Judge Crigler observed, Michel's testimony was "laced with contradictions." (Id. at 14.) For example, Michel testified on direct examination that the only contact he had with Smith before trial was a single visit by Smith to the jail where Michel was detained pending trial. (Docket No. 897 at 14–

15.) However, on cross-examination, Michel retreated from this harsh position, conceding that Smith had visited him in jail prior to trial numerous times in 2006 and 2007. (Id. at 55–56.) Michel acknowledged as well that he communicated with Smith by telephone many times before trial. (Id. at 57.)

Freiwald's testimony concerning a certain pretrial meeting casts further doubt on the credibility of Michel's testimony. Freiwald testified that, prior to trial, he met with Smith and Michel to review an evidentiary videotape. (Id. at 77.) However, earlier in the hearing, Michel had testified that this meeting with Smith and Freiwald never happened. (Id. at 58–59.) In fact, Michel asserted that the video of which Freiwald spoke was "fake." (Id. at 41, 65.)

Michel also testified that he did not speak English at the time of the trial. (Id. at 16.) He further testified that the only reason that he was able to speak English during the evidentiary hearing was that, since the trial, he had undertaken schooling to learn English. (Id.) However, Michel's representations concerning the poorness of his English proficiency at the time of the trial are rendered suspect by his later admissions during the course of the evidentiary hearing. Michel testified that Smith never utilized an interpreter during any of their pretrial meetings or phone conversations—hence, all of their pretrial communications were conducted in English. (Id. at 12, 17, 61.) Furthermore, Michel testified that, prior to his arrest, he lived in Winchester with his girlfriend, Laquita Sloane. (Id. at 25, 53.) Michel conceded that, because Sloane knew only English, he communicated with her solely in English. (Id. at 53.) However, when asked if he communicated with other people in Winchester, Michel responded: "I don't communicate to people in Winchester. I communicate with my girlfriend, because I ain't never been with people in Winchester." (Id. at 54.) Michel's testimony concerning his poor English at trial is also contradicted by Freiwald, who testified that he detected no difference in Michel's English

9

proficiency during the evidentiary hearing as compared to his English proficiency at the pretrial meeting related to the videotape. (Id. at 77.)

At one point during his cross-examination at the evidentiary hearing, Michel professed his innocence, claiming initially that he possessed documents substantiating that he was not present in the Winchester area at the time of some of the alleged drug transactions. (Id. at 63.) However, after being pressed to produce this documentation, Michel withdrew his claim of documentary support and, instead, contended simply that the person about whom everyone was speaking was "not me." (Id. at 64.)

Michel also sought to impugn the quality of Smith's representation at trial. According to Michel, Smith failed to elicit in his cross-examination of the government witnesses their status as convicted drug dealers and their incentive to testify against him. (Id. at 42–45.) Michel further testified at the evidentiary hearing that Smith likewise failed to broach these topics in the course of his closing argument to the jury. (Id. at 45–46.) As Judge Crigler noted in the Report, Michel alleged that Smith "offered little to nothing in the way of exculpatory evidence." (Docket No. 904 at 15.) In essence, Michel attempted to portray Smith's trial representation as a shoddy effort in which Smith did not consult with Michel and in which Smith utterly failed to elicit any points that would benefit Michel's case. In fact, Michel even went so far as to state at the evidentiary hearing that "Smith help [sic] the government." (Docket No. 897 at 66.) After Michel levied these allegations, Judge Crigler queried, "Now, if the transcript of the proceedings show [sic] otherwise, what is the Court to do? If the transcript shows that Mr. Smith made th[ose] very argument[s], what is the Court to do with what you just said?" (Id. at 46.) Michel responded by stating simply, "Judge, you can do anything you want to do." (Id.)

10

Judge Crigler's question has proven to be a premonition of the state of the trial record—the trial transcript flatly refutes Michel's assertions regarding the substance of Smith's representation. For example, as Judge Crigler noted, "the cross examinations of [two government witnesses] demonstrate that Smith questioned them about their experiences as drug dealers and their incentive to cooperate with law enforcement in exchange for potential reductions in their sentences." (Docket No. 904 at 15.) Furthermore, as Judge Crigler observed, the transcript of Smith's closing argument reveals that he did, in fact, emphasize to the jury that the government's witnesses should not be believed based on their status as convicted criminals and "liars[,]" and on their personal incentives to cooperate with the government. (Id. at 16.) Smith also sought to impress upon the jurors' minds that various nicknames associated with drug dealers had been improperly attributed to Michel. (Id. at 13.) In short, Judge Crigler observed, "the trial transcript makes clear that many of Michel's claims about how Smith represented him during trial are patently false." (Id. at 16.)

Judge Crigler also took a step back from the specific, substantive details of Michel's testimony and observed generally that Michel's "demeanor and conduct while testifying" lent further weight to a finding of incredibility. (Id. at 14.) In making its own independent review of the transcript from the evidentiary hearing, this court notes that Michel was argumentative, contentious, evasive, and unresponsive to questions. Furthermore, Michel manifested overtly accusatory behavior, perhaps best evidenced by Michel's allegation that the prosecutor was a "mole" who was lying and hiding evidence from the court and the jury. (Docket No. 897 at 48–49.) Numerous other instances illustrated Michel's penchant for placing the blame on others. Succinctly stated, the record from the evidentiary hearing leads the court to only one finding—specifically, that Michel's testimony is not credible.

### b. Presumption of propriety in favor of court interpreter

However, a more important factor supporting this court's finding of incredibility emanates from a presumption that a court interpreter translates communications with propriety, accuracy, and integrity. Once again, Michel contends that the Haitian Creole interpreter who translated the trial proceedings for Michel's benefit failed to communicate to Smith that Michel had voiced an intent to exercise his Fifth Amendment right to testify. Michel would have the court believe that he was linguistically incapable of conveying his intent directly to Smith.

A number of state courts have recognized that "[t]here is a rebuttable presumption that an interpreter in the course of performing his official duty has acted regularly." State v. Casipe, 686 P.2d 28, 33 (Haw. Ct. App. 1984); see also, e.g., Shaha v. State, 236 P.3d 560, 565 (Kan. Ct. App. 2010) ("Absent some contrary showing, courts presume that an interpreter exercising his or her official duties has acted properly."); State v. Mendoza, 891 P.2d 939, 942 (Ariz. Ct. App. 1995) ("[I]t is presumed that court interpreters will correctly carry out their duties and that oaths will be properly administered."); Thomason v. Territory, 13 P. 223, 228 (N.M. 1887) ("Acting under oath and the order of the court, the presumption should be in favor of proper action by [an interpreter], rather than against it. . . . If this officer of the court did or said anything prejudicial, that is a fact for the defendant to show . . . ."). Furthermore, a limited number of federal courts have likewise recognized that, "upon a collateral attack, an . . . interpreter is cloaked with the presumption of regularity, which 'allows a court to assume that an official or person acting under oath of office will not do anything contrary to his or her official duty.'" Hou v. Walker, No. CV 96 1365, 1996 WL 684442, at *3 (E.D.N.Y. Nov. 20, 1996) (quoting People v. Bicet, 580 N.Y.S.2d 55, 56 (N.Y. App. Div. 1992)); see also Clervil v. McNeil, No. 08-20144-CIV, 2008 WL 4753575, at *12 (S.D. Fla. Oct. 28, 2008) (citing Hou, 1996 WL 684442, at *3).

In any event, this court believes that, even without this supporting authority, a presumption of propriety should accompany a court interpreter in the performance of his or her official duties. The law recognizes many presumptions that place the onus to adduce rebuttal evidence on the party attacking the presumption. See, e.g., Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994) (recognizing a "presumption against retroactive legislation"); AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (recognizing a "presumption of arbitrability" when a contract contains an arbitration clause); United States v. Chem. Found., Inc., 272 U.S. 1, 14–15 (1926) (recognizing a "presumption of regularity" that undergirds the official acts of public officers, causing courts to presume that they have properly discharged their official duties); Nibagwire v. Gonzales, 450 F.3d 153, 156 (4th Cir. 2006) (recognizing a "presumption of effective delivery" with respect to regular mail); United States v. Lambey, 974 F.2d 1389, 1394 (4th Cir. 1992) (en banc) (recognizing a "presumption that [a] plea [of guilty] is final and binding" if the plea was made during a properly conducted hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure); 79 Am. Jur. 2d Wills § 374 (2002) (recognizing a "presumption of undue influence" under the laws of different states in the context of wills); see also 2 Kenneth S. Broun, McCormick on Evidence § 343 (6th ed. 2006 & Supp. 2009) (explaining presumptions in general and listing "illustrative presumptions").

In support of its belief that the law should reflect a presumption of propriety in favor of court interpreters, the court notes that courts in general have recognized that various professionals are entitled to presumptions that they perform their duties accurately. See, e.g., Strickland, 466 U.S. at 689 (recognizing, in ineffective assistance of counsel claims, a "presumption that counsel's conduct falls within the wide range of reasonable professional assistance"); Youngberg v. Romeo, 457 U.S. 307, 324 (1982) (establishing a presumption of

13

correctness with respect to decisions rendered by appropriate medical professionals); Froelich v. Senior Campus Living LLC, 355 F.3d 802, 810 (4th Cir. 2004) (recognizing that, pursuant to the business judgment rule, the decisions of business professionals on the board of directors should be presumed valid). This court is of the opinion that court interpreters should likewise be accorded such a presumption in the execution of their official duties. Court-appointed interpreters qualify for service based on their ability to satisfy certain objective standards. See 28 U.S.C. § 604(a)(14)–(16) (providing that the duties of the Director of the Administrative Office of United States Courts include the establishment of a "program for the certification and utilization of interpreters in courts of the United States"); id. §§ 1827–28 (setting forth more specific guidance with respect to the Director's duty to establish a program for certifying and utilizing interpreters in federal courts); Guide to Judiciary Policy: Court Interpreting § 320 (2011), available at http://www.uscourts.gov/uscourts/FederalCourts/Publications/Guide_Vol05.pdf (describing the standards that govern qualification for service as a court interpreter); Charles M. Grabau & Llewellyn Joseph Gibbons, Protecting the Rights of Linguistic Minorities: Challenges to Court Interpretation, 30 New Eng. L. Rev. 227, 255–60 (1996) (summarizing and discussing the qualifications for court interpreters). In addition to qualifying for service, federal court interpreters must "give an oath or affirmation to make a true translation." Fed. R. Evid. 604.

Based on the requirements that court interpreters must satisfy certain objective standards and must take an oath to translate truthfully, and based on the decisions of other courts assigning similar presumptions to other qualified professionals, this court holds that court interpreters are entitled to a presumption that they execute their official duties with propriety, accuracy, and integrity. To rebut this presumption, an individual must adduce specific evidence of impropriety

by the interpreter. See 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6055, at 374 (2d ed. 2007) ("[T]he party attacking a translation has the burden of showing it deficient and prejudicial. Absent such a showing, there is a presumption that the interpreter has properly performed." (footnote omitted)).[9]

Applying this presumption of propriety to the facts of the instant case constrains the court to conclude that Michel has adduced no specific evidence demonstrating impropriety by the court interpreter at trial. Although Michel alleges that the court interpreter failed to convey to Smith the invocation of Michel's right to testify, Michel conceded, after further probing by Judge Crigler at the evidentiary hearing, that he, in fact, did not know whether the interpreter conveyed his request to Smith, because the trial transcript did not reflect such communications. (Docket No. 897 at 16, 19.) Hence, by Michel's own admission, he lacks any specific evidence that the interpreter failed to communicate to Smith his invocation of his right to testify. For this reason, Michel has failed to overcome the presumption of propriety in favor of the court interpreter who served at his trial. As explained above, this failure to adduce specific evidence supporting his claim, central to this § 2255 motion, that he attempted unsuccessfully to invoke his right to testify through the interpreter, adds further support to the court's finding of incredibility regarding Michel's testimony at the evidentiary hearing.[10] In short, the court finds no credible evidence to support Michel's claims that he and Smith did not discuss the prospects of Michel testifying at trial or that his attempt to invoke that right were frustrated by the court interpreter.

---

[9] The interpreter from Michel's trial was not called as a witness at the evidentiary hearing.
[10] Michel's credibility is further compromised by the fact that this presumption of propriety also undercuts Michel's unsupported allegation that "[t]here's a lot of thing [sic] I told the interpreter he don't [sic] tell [Smith]." (Id. at 19.)

15

### c. Michel knew that he could have testified at trial

Finally, the court's finding of incredibility is further bolstered by the fact that the record from the evidentiary hearing establishes that Michel knew that he could have testified at trial. Even though, according to Michel, he did not know of his right to testify, "[he] knew that [he] could talk if [he] wanted to." (Id. at 68.) Despite Michel's awareness of his ability to testify,[11] he made no sincere effort to do so. By Michel's own admission, he had communicated with Smith many times prior to trial without the aid of an interpreter. He has provided no credible reason as to why, at trial, he could not have communicated his desire to testify directly to Smith, instead of to the interpreter.

### III. Conclusion

Based on the analysis set forth above, the court will adopt the Report insofar as it recommends that this court find Michel's testimony incredible.[12] More specifically, this court makes the following factual findings: the court finds incredible Michel's allegation concerning Smith's failure to advise him of his right to testify and concerning Michel's allegations regarding his unsuccessful attempt at trial to invoke his right to testify through the interpreter. Thus, based

---

[11] Michel objects to Judge Crigler's finding that Michel knew that he could have testified at trial. (Docket No. 906 at 6.) According to Michel, the record of the evidentiary hearing "only establishes that he had a desire to testified [sic] which he attempted to relate to Trial Counsel through his interpreter." (Id.) Contrary to Michel's objection, though, his testimony at the evidentiary hearing clearly establishes that, even though he might not have known of his right to testify, he knew that, if he so desired, he could have testified at trial. (Docket No. 897 at 68.)

[12] Michel also objects to Judge Crigler's credibility determination. (Docket No. 904 at 2.) According to Michel, even if this court adopts the "Report's finding that Mr. Michel's testimony was not credible with respect to the nature and extent of his communications with Trial Counsel, that credibility determination is irrelevant to the Report's correct finding that Mr. Michel was denied his right to testify." (Id. (internal citation omitted).) Michel further argues that, "[u]ltimately, the Report makes a credibility determination with respect regarding [sic] Mr. Michel's testimony on October 12, 2011, though that testimony has nothing to do with the prejudice Mr. Michel suffered at that trial in 2007 when he was not allowed to testify regarding the charged criminal conduct." (Id. at 2–3 (emphasis in original).) In essence, Michel argues that this court may not extrapolate its finding of incredibility with respect to Michel's evidentiary hearing testimony and apply it to the substance of Michel's allegations.

However, Michel's objection is meritless and, in fact, directly conflicts with the central reasoning of the instant opinion. Contrary to Michel's objection, the credibility of his testimony at the evidentiary hearing has everything to do with the substance of Michel's allegations regarding the prejudice that he allegedly suffered. Because this court finds Michel's testimony at the evidentiary hearing incredible, the court does not believe that Michel suffered the prejudice of which he complains.

on these factual findings, the court concludes that Michel has failed to demonstrate any constitutional error.[13] Accordingly, the court will grant the government's motion to dismiss (Docket No. 802) and will deny Michel's motion to vacate (Docket No. 787). Additionally, because Michel has failed to demonstrate "a substantial showing of the denial of a constitutional right[,]" the court will deny a certificate of appealability. 28 U.S.C. § 2253(c).

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to Michel and to all counsel of record.

ENTER: This 28th day of March, 2012.

_____
Chief United States District Judge

---

[13] Michel's remaining objections to the Report are thus rendered moot—based on the court's factual findings regarding Michel's complete lack of credibility, the court need not consider Michel's objections to the Report's legal conclusions concerning the substance of his ineffective assistance of counsel claim.